REGAN, Judge.
Plaintiff, Eugene Griffith, a laborer, employed by defendant, Boh Brothers Construction Company, at a wage rate of approximately $48.00 per week, instituted this suit against Boh Brothers Construction Company and its insurer, the Travelers Insurance Company, for total and permanent disability under the Workmen’s Compensation Act of Louisiana, LSA- — RS 23:1021 et seq., claiming that, because of certain injuries incurred by him on August 15th, 1946, he is entitled to four hundred weeks compensation at the rate of $20.00 per week, from the date of the injury, or the sum of $8,000.00, subject to a deduction of all compensation payments previously paid.
Defendants answered admitting both the employment and the occurrence of the accident; that plaintiff was disabled for a period of thirty-nine weeks, during which time he was paid $780.00 compensation; that the average weekly wage rate was $48.00; however, in the final analysis, defendants denied that plaintiff is permanently and totally disabled, and maintained that there were no further compensation payments due him after May 15th, 1947, and that, in any event, the disability complained of by plaintiff was not attributable to the accident of August 15th, 1946.
The court, a qua, rendered judgment in favor of defendants, dismissing plaintiff’s suit. Hence this appeal by plaintiff.
Tile record reveals that the accident occurred oh August 15th, 1946, at about 10:-00 a. m., when a “well point” or length of iron pipe fell and struck plaintiff on the head, rendering him unconscious which caused him to fall to the ground. Plaintiff was removed from the situs of the accident by two other employees to the office of Dr. Joseph T. Scott, located in 630 Gravier Street, in the City of New Orleans. Dr. John T. Andrews, a physician and surgeon associated in the practice of medicine with Dr. Scott, ' examined the plaintiff at approximately 11:00 a. m. on the morning of the accident.
Dr. Andrews testified that plaintiff complained of only pain in his head and that x-rays were made of the skull and were found “to be negative for all head injuries.” An examination was also made of the cranial nerves and peripheral reflexes and they were found to be normal.
Dr. Scott testified that plaintiff initially consulted him on September 26th, 1946, and that his examination was negative; that plaintiff only complained of headaches at the time and that he was so much better on October 3rd, that he was discharged and it was suggested that he resume work on October 7th, 1946, but to return' to the office for further treatment. Plaintiff later returned to Dr. Scott’s office complaining of headaches and, on this occasion, Dr. Scott referred him to Dr. Gilbert Anderson, ah eminent neurologist.
Prior to the trial of this matter in the court below, Dr. Anderson died and, therefore, there is no oral testimony by him in the record. There are, however,. several letters written by Dr. Anderson addressed to both Dr. Scott and Dr. Ficklen. According to a letter dated November 23rd, 1946, Dr. Anderson informed Dr. Scott that he had examined plaintiff on November 18th, 1946, and ascertained that “he still has some pain in his head, but .it is not constant and he also complains of pain about the left hip and in the leg * * *. Pain in the left lower extremith with the atrophy and absent achilles reflex, is indicative of a sciatic nerve lesion which probably existed prior to the present injury with which it is not likely associated.”
*71 Although Dr. Anderson?s letter is dated November 23rd, 1946, Dr. Scott testified that he had received a telephone call from Dr. Anderson on November 22nd, 1946, divulging the contents of the said letter. On November 22nd, 1946, Dr. Scott discharged plaintiff with no permanent disability and, in conformity therewith, the compensation payments to plaintiff were terminated.
Plaintiff then sought and obtained the professional services of Mr. David Herman, an attorney of this City, who, in pursuing the matter further, discussed plaintiff’s case with á representative of the insurer and apparently it was mutually agreed that plaintiff should be further examined by Dr. 'Irving Redler, a specialist in the field of orthopedic surgery.
Dr. Redler wrote to Mr. Herman, under date of January 11th, 1947, advising him that he had examined the plaintiff relative to a complaint of “pain in the left hip and leg”, which examination disclosed the necessity of taking x-rays. These x-rays reflected “simple fractures of the left ischium and middle third of the shaft of the left fibula at the time of his injury. * * *. The prognosis for eventual recovery is good with adequate therapy.”
Following Dr. Redler’s examination- of plaintiff, the Travelers Insurance Company reimbursed plaintiff for compensation payments which had been terminated on November 22nd, 1946. The payments were thereafter maintained through May 15th, 1947, when they were again discontinued after the receipt of a letter, dated May 19th, 1947, from Dr. Redler, by Mr. Winston, a representative of the Travelers Insurance Company, which stated that he had treated the plaintiff on twenty different occasions during the previous three month period and that “the patient still walked with a limp of his left leg and, in my opinion, it was habitual. It was something he had -been carrying on and had become a habit and despite repeated instructions to the patient in the method of normal walking, I have never been able to correct it. * * * I came to the conclusion objectively there was no question that Griffith had improved” and “I cannot help but feel that he will continue to limp and will continue to complain of pain until his case is finally settled.” Dr. Redler, upon interrogation by the judge, a quo, relative to the significance of the foregoing statement, responded: “When the litigation aspect has been settled, and I am sure I stated that the average patient who was free from possible litigation and that presented the same disability that this patient showed, would have responded completely to the treatments by this time.”
Following the last examination by Dr. Redler, plaintiff was then referred, by his attorney, to Dr. E. H. Maurer, also a specialist in the field of- orthopedics, who, after making an examination, addressed a letter to plaintiff’s attorney, under date of June 6th, 1947, stating: “This man’s head condition is the usual sequela following head injury. The sciatic nerve' condition is disabling and prevents him from returning to the duties of his occupation.”
Upon receipt of this letter a compromise compensation settlement of $400.00 was agreed upon by the Travelers Insurance Company and-plaintiff’s counsel, subject,, of course, to the approval of the plaintiff. Plaintiff refused this offer of settlement and his counsel thereupon withdrew from the case. Shortly thereafter, plaintiff procured the professional services of his present counsel, Mr. Lubin F. Laurent, who referred plaintiff to Dr. Henry A. LaRocca, a physician and surgeon.
Dr. LaRocca, in a letter dated September 23rd, 1947, addressed “To Whom It May Concern”, stated: “This is to certify that I have treated E. Griffin (Griffith), and find him to be suffering from sacro-lumbar strain, with involvement of the nerve, caused from an accident. He will be ¡partially disabled to the extent of about 40%.”
Following the receipt' of this letter by plaintiff’s counsel, a second compromise compensation settlement of $925.00 was agreed upon and a joint petition of employee, employer and insurer was filed in the Civil District Court for the Parish of Orleans, endeavoring to obtain the necessary authority to effect the compromise settlement. The case was allotted to Hon. Harold A. Moise, then Judge of Division “A”, who, before approving the settle *72 ment, recommended that' further -medical examinations be made of plaintiff’s injuries. The interested parties agreed and plaintiff was referred to Dr. E. A. Ficklen, a physician and-surgeon, who had, incidentally, been selected by the court.
In a letter dated March 31st, 1947, addressed to plaintiff’s counsel, Dr. Ficklen stated that he was of the opinion that “there is every reason to believe that this man has sustained an injury to an interver-tebral disc, probably between the fourth and fifth vertebra. * * * If this diagnosis is correct the man is- at present totally disabled on- account of pain, even though his left lower extremity has retained about 50% of weight ■ bearing ■* * *. It is strongly recommended, if this is in order, that this man be seen by a neurosurgeon with wide experience in ‘disc’ cases with a •view to operation.”
Plaintiff was referred for the second time to Dr. Gilbert Anderson and subsequently, by virtue of a letter dated November 25th, 1947, addressed to Dr. Ficklen, Dr. Anderson stated that he was of the opinion that “at the time of my previous report I was of the impression that the sciatic had antedated the injury, but apparently this was not correct. At any rate, the present picture, both as refers to history and physical examination, strongly suggests a ruptured in-tervertebral disc, which seems the most likely diagnosis. I would -suggest that this aspect of the case be1 further investigated by x-ray studies and perhaps a myélogram.”
On January 7th, 1948, Dr. Anderson informed Dr. Ficklen that tUe myelogram revealed no definite evidence of a ruptured disc.
■ All interested parties again appeared before Judge Moise who, apparently, exercising an abundance of judicial caution, refused to approve the compromise compen.sation settlement, a fortiori, plaintiff instituted the present suit.
Plaintiff insists that he is totally and permanently disabled as. a result of the accident which occurred on August 15th, 1946. In opposition thereto, defendants vigorously maintain that plaintiff is not totally and permanently disabled and that, in any event, the disability complained of by plaintiff is not attributable to the accident of August 15th, 1946.
After the suit was filed and before the trial thereof, the defendants employed the National Corporation Service, a detective agency, to procure a confidential report in connection with the physical activities of the plaintiff, which might tend to militate against the substantiation of plaintiff’s contention that he was totally and permanently disabled. Henceforth, plaintiff was “shadowed” on various and sundry occasions and particularly on February 16⅛, 17th and 19th and May 20th, 1948. On these days motion pictures were surreptitiously taken of plaintiff, through the medium of a Bell and Howell 16 Millimeter Camera equipped with an F 4.5 telephoto lens, showing plaintiff engaged in the ■ performance of laborious1 work. These motion pictures were properly verified by witnesses who were employed by the detective agency, and their testimony, together with the films, is part of the record.
During the trial of t'he case on its merits in the court, a qua, plaintiff testified that he was carried to the office of Dr. Scott by two employees of the Boh Bros. Construction Company, and that he was placed on a table in the x-ray room, at which time “I was dizzy in the head” and “my leg and my hip was hurting me at that time.” He further testified that he had called Dr. Andrews’ attention to the pain in his left leg, but that Dr. Andrews stated “that it was just -a bruise” and that Dr. Andrews did not examine his leg. Plaintiff stated that he. visited “The Travelers Insurance Company and complained about my leg, you know. My leg would quit on me if I tried to work on my leg. They put me on some job doing heavy work and I couldn’t make it and I came to the Travelers Insurance .Office and I told them I tried to- work and I couldn’t, work. I told -the young gentleman there and he took a report on it and when I went back there he said ‘well, we are going to send you to Dr. Anderson’.” Plaintiff insisted that he still suffered severe pain at the time of the trial, and.which did not exist before the accident.
*73 Plaintiff’s wife corroborated 'plaintiff’s testimony to the effect that he suffered severe pain in his left leg which has persisted since the occurrence of the accident.
The only question posed for our consideration, by virtue of-the pleadings and the foregoing medical testimony, is whether the plaintiff is totally and permanently disabled as. a result of the alleged injuries received on August 15th, 1946.
It will be observed that it was not until January 7th, 1947, five months after the accident, confirmed by letter of January 11th, 1947, when plaintiff was examined by Dr. Redler that x-rays were taken of his leg and evidence of the healed fractures of the left ischium and the middle third of the shaft of the left fibula were revealed. Neither in his own testimony nor in the letter of January 11th, 1947, does Dr. Redler connect the leg fractures with the head injuries received by plaintiff on August 15th, 1946. Dr. Redler made no effort to connect the sciatica nerve lesion with the head injury.
It is also significant to observe that in conducting tests concerning the peripheral reflexes on August 15th, 1946, Dr; Andrews stated that the lower extremities were handled vigorously and that if plaintiff had a broken tibia “it would have caused so much pain he could not have stood it.” Dr. Andrews, upon being interrogated: “Isn’t it a fact, Doctor, that you sent Eugene Griffith to Dr. Anderson strictly on account of his leg injury?” replied “That is not the case at all * * *. If he came in complaining of pain in his leg and we were to send him to a specialist, the first man we would send him to if we were going to send him to anybody, would be an orthopedic specialist and Dr. Anderson' is not an orthopedic specialist; he is a neurologist, a brain and nerve specialist * * *. When the man told me he still had headaches, I thought Dr. Anderson, being a specialist, might find some cause for the headaches which I couldn’t find * * *. tie never even mentioned he had a bruise. It would seem to me that if I would record on his chart such a minor thing as constipation, I ■ would certainly record any bruise he might have had.”
We are of the opinion that the fractures of’the left fibula and of the left ischium and any sciatica, of which plaintiff complains, did not occur as. a result or consequence of the accident of August 15th, 1946.
’ It will be observed that five medical experts testified or submitted their written opinions on behalf of plaintiff and two on behalf of defendants. This 'is exceptional. Usually, the numerical' preponderance of medical testimony contained in the record is in favor of defendants, however, it will be noted that the only physician who examined plaintiff and observed him on the day of the accident, August 15th, 1946, and treated him for two months thereafter, was Dr. Andrews, and he states positively that plaintiff did not complain of pain in his 'left leg or hip. Dr. Andrews’ testimony was sincere, honest and forthright, therefore, it impressed us. It was at least three months after the accident before any of plaintiff’s physicians had an opportunity to observe and examine him relative.to his injuries.
We are unwilling, in view of no manifest error on the part of the trial judge, involving an unadulterated question of fact, to> substitute our judgment for his and express the unequivocal opinion that the medical expert testimony preponderates in favor off the .plaintiff. On the contrary, we are of the 'opinion that plaintiff has- not sustained the burden of proof resting- on him to establish, by a fair preponderance of the evidence, that he was the recipient cif injuries as a result of the accident of August 15th, 1946, which rendered him totally and permanently disabled.
In our opinion the following revelation fortifies the foregoing conclusion: the oral •argument of counsel for the defendants was interrupted' at the propitious moment in order to afford the members of this court an opportunity to view the motion pictures, surreptitiously taken between the time that the suit was filed and subsequently tried in the court, a qua, showing the plaintiff excavating, through the use of a shovel, trenches in which concrete or brick founda.-tions were to be laid for the purpose of erecting a residence for a Mr. Donahue, who had employed plaintiff to do this .work. This occurred approximately two weeks *74 after plaintiff had fled his suit in the Civil District Court alleging that he was totally and permanently disabled to perform the work in which he had been engaged prior to his injury.
Plaintiff testified that his occupation pri- or to' his injury was: “I dig holes, just like to be used in house connections and put down a well point. We dig holes for that.”
The pictures which we reviewed reflect plaintiff engaged in exactly this type of laborious work, excavating trenches for a residential foundation.
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.